1  B. Kristian W. Rasmussen, FL Bar No. 0229430
   Cory, Watson, Crowder, & DeGaris
2  2131 Magnolia Avenue, STE 200
   Birmingham, AL 35205
3  Phone: (205) 328-2200
   Fax: (205) 324-7896
4  E-Mail: krasmussen@cwcd.com

5  Attorneys for Plaintiff

6
# E-filing
7

8  UNITED STATES DISTRICT COURT

9  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  (SAN FRANCISCO DIVISION)

11  CV 08 0794

12  **In re: Bextra and Celebrex Marketing Sales**    MDL No. 1699
    **Practices and Product Liability Litigation**

13                                          **District Judge: Charles R. Breyer**
                                            **Magistrate:**
14
                                            *CRB*
15

16
    **BRIAN SCOGIN**, individually,            Case No. _____
17
                                            **CIVIL COMPLAINT**
18          Plaintiff,

19  v.
                                            **JURY TRIAL DEMANDED**
20  PFIZER, INC., PHARMACIA CORP., and
    G.D. SEARLE, LLC, (FKA G.D. SEARLE
21  & CO.),

22          Defendants.

23

24          PLAINTIFF, BRIAN SCOGIN, individually, pursuant to Pretrial Order 12, by and

25  through counsel and pursuant to applicable law, brings this action against Defendants PFIZER,

26  INC., PHARMACIA CORP., and G.D. SEARLE & CO. (hereafter "Defendants") and alleges as

27  follows:

28

## I.    PARTIES

1.    This is an action for damages arising from Defendants' design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Valdecoxib, trade name BEXTRA® ("Bextra").

2.    Plaintiff is and was at all relevant times adult resident citizens of Arkansas, residing at the address in the City, State and County identified in Section IV(A) herein. ("Named Plaintiff's Home District"). The Named Plaintiff's Home District is proper for purposes of remand, transfer, and venue.

3.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business in New York.  In 2003, Pfizer acquired Pharamcia for nearly $60 billion.  At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name Bextra in Named Plaintiff's Home District and nationwide.

4.    Defendant Searle ("Searle") is a Delaware corporation with its principal place of business in Illinois.  At all relevant times, Searle has been engaged in the business of marketing and selling Bextra nationwide and in Named Plaintiff's Home District.  Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this Complaint.

5.    Defendant Pharmacia ("Pharmacia") is a Delaware corporation with its principal place of business in New Jersey.  At all relevant times, Pharmacia, and its predecessors in interest have been engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling Bextra nationwide and in Named Plaintiff's Home District.

## II.    JURISDICTION AND VENUE

6.    This is an action for damages, which exceeds seventy-five thousand dollars ($75,000.00).

7.    There is complete diversity of citizenship between the Plaintiff and Defendants.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A.

Bextra-MDL                          - 2 -                          COMPLAINT

1    § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and

2    because there is complete diversity of citizenship between Plaintiff and Defendants.

3          8.     This action is being filed in the Northern District of California Pursuant to

4    MDL 1699, Pretrial Order No. 2. However, venue is proper in the Named Plaintiff's Home

5    District pursuant to Pretrial Order 12 and 28 U.S.C.A. § 1391. Defendants marketed, advertised

6    and distributed the dangerous product in the Named Plaintiff's Home District, thereby receiving

7    substantial financial benefit and profits the dangerous product in the Name Plaintiff's Home

8    District, and reside in the Named Plaintiff's Home District under 28 U.S.C.A. § 1391(c), such that

9    venue is proper.

10          9.     At all relevant times herein, Defendants were in the business of designing,

11   manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and

12   selling their product, Bextra. Defendants at all times relevant hereto designed, developed,

13   manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce

14   (including Named Plaintiff's Home District) the aforementioned prescription drug. Defendants

15   do substantial business in the State of Named Plaintiff's Home District, advertise in the district,

16   receive substantial compensation and profits from sales of Bextra in the District, and made

17   material omissions and misrepresentations and breaches of warranties in the District so as to

18   subject them to *in personam* jurisdiction in the District. In engaging in the conduct alleged herein

19   each defendant acted as the agent for each of the other defendants, or those defendant's

20   predecessors in interest.

21   **III.    INTERDISTRICT ASSIGNMENT**

22          10.    Assignment to the San Francisco Division is proper as this action is related

23   to *In Re: Bextra and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to

24   the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,

25   2005.

26   **IV.    FACTUAL BACKGROUND**

27   **A.    Facts Regarding Plaintiff**

28

1     11. Plaintiff, BRIAN SCOGIN, is an adult resident citizen of Arkansas,

2 residing at 335 Samantha Drive, Austin, AR 72003 in Lonoke County. For purposes of remand,

3 transfer and venue, this is in the Eastern District of Arkansas. BRIAN SCOGIN was prescribed,

4 and began taking, Bextra on or about August 27, 2002. As a direct and proximate result of using

5 Bextra, Plaintiff suffered severe cardiovascular injuries. Specifically, on or about April 11, 2005

6 Plaintiff suffered a cardiovascular injuries including RLL Infarction "pulmonary embolis" which

7 caused Plaintiff's damages and injuries set forth herein.

8     12. Unaware of the risks presented by Bextra, or that Bextra was the cause of

9 the respective injuries, Plaintiff continued to take Bextra until the date of his adverse

10 cardiovascular event.

11     13. Plaintiff and Plaintiff's healthcare providers were at the time of Plaintiff's

12 adverse cardiovascular event unaware—and could not have reasonably known or have learned

13 through reasonable diligence—that such injury directly resulted from Defendants' negligence and

14 otherwise culpable acts, omissions, and misrepresentations or from Plaintiff's ingestion of Bextra.

15     14. Plaintiff used Bextra in a proper and reasonably foreseeable manner and

16 used it in a condition that was substantially the same as the condition in which it was

17 manufactured and sold.

18     15. Plaintiff would not have used Bextra had Defendants properly disclosed the

19 risks associated with the drug.

20    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

21 compensatory damages, and exemplary and punitive damages together with interest, the costs of

22 suit and attorneys' fees and such other and further relief as this Court deems just and proper.

23  **B.** **Facts Regarding Bextra**

24     16. Bextra is one of a class of pain medications called non-steroidal anti-

25 inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade

26 name Advil) are examples of well-known NSAIDs.

27     17. NSAIDs reduce pain by blocking the body's production of pain

28 transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX

Bextra-MDL     - 4 -     COMPLAINT

1  enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and
2  COX-2 enzymes.

3          18.     In addition to decreasing inflammation, the prostaglandins that are
4  supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the
5  stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the
6  medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric
7  tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including
8  stomach ulceration and bleeding. Prostaglandin I2 is the predominant cyclooxygenase product in
9  endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation,
10  and preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit
11  Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected.
12  Thromboxane A2 is a potent platelet aggregator and vasoconstrictor which is synthesized by
13  platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction,
14  the COX-2 inhibitors support it. Traditional NSAIDs like aspirin reduce pain/inflammation and
15  therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be
16  expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do
17  not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

18          19.     Defendants and other pharmaceutical companies set out to remedy these
19  ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors
20  that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of
21  gastric tissue while still reducing inflammation.

22          20.     In making this decision, Defendants and their predecessors in interest either
23  intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2
24  inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood
25  clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,
26  unstable angina. The vasoconstriction and fluid retention cause the hypertension.

27          21.     The defendants launched Celebrex, the first of the three major COX-2
28  inhibitor drugs, in early 1999 and initiated a massive marketing campaign to convince doctors and

Bextra-MDL                               - 5 -                                    COMPLAINT

1   consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs. In

2   May, 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

3        22.     Seeking increased market share in this extremely lucrative market,

4   Defendants, and their predecessors in interest, also sought approval of a "second generation"

5   selective COX-2 inhibitor and filed for FDA approval of Bextra on January 16, 2001 for the

6   (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief

7   of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

8        23.     The FDA granted approval of the new drug on November 16, 2001, for two

9   particular uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

10   of osteoarthritis and rheumatoid arthritis.

11        24.     The FDA did not grant approval to market and promote Bextra for the

12   management or prevention of acute pain.

13        25.     The FDA did not grant approval to promote Bextra as more effective than

14   other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers

15   or gastric bleeding.

16        26.     Even without a label that allowed Defendants to legitimately claim superior

17   safety, when Defendants, and their predecessors-in-interest, began marketing Bextra in early

18   2002, Defendants and their representatives and agents misrepresented the safety profile of Bextra

19   to consumers, the medical community, healthcare providers, and third party payors. Defendants

20   proceeded to promote, market, sell, and distribute Bextra as a much safer and more effective pain

21   reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

22   **C.**    **Facts Regarding Bextra's Safety**

23        27.     The potential for cardiovascular risk of selective COX-2 inhibitors was

24   known to Defendants long before the FDA granted market approval for Bextra. By 1997, and

25   prior to the submission of the New Drug Application (the "NDA") for Bextra, Defendants were

26   aware that, by inhibiting COX-2, Bextra altered the homeostatic balance between prostacylcin

27   synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing

28   blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of Cardiovascular*

Bextra-MDL              - 6 -               COMPLAINT

1    *Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954. Although all

2    COX-2 inhibitors have this mechanism of action, Bextra was the most selective COX-2 inhibitor

3    proposed for approval. Accordingly, it had the greatest potential to cause adverse cardiovascular

4    and cerebrovascular events.

5         28.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of

6    Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on

7    October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as

8    Bextra, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet

9    aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

10        29.    Nevertheless, the Defendants submitted an NDA to the FDA for Bextra,

11   omitting information about the extent of the risks associated with Bextra. Without a complete

12   picture of the potential hazards associated with the drug, the FDA approved Bextra on or about

13   November 16, 2001.

14        30.    Based on the studies performed on Bextra, other COX-2 inhibitors, and

15   basic research on this type of selective inhibitor which had been widely conducted, Defendants

16   knew when Bextra was being developed and tested that selective COX-2 inhibitors posed serious

17   cardiovascular risks for anyone who took them, and presented a specific additional threat to

18   anyone with existing heart disease or cardiovascular risk factors.

19        31.    Studies show that selective COX-2 inhibitors, including Bextra, decrease

20   blood levels of a prostacyclin. When those levels fall, the arteries are more vulnerable to clotting,

21   high blood pressure, heart attack, and stroke.

22        32.    The defendants marketed Bextra in the United States for three years (April,

23   2002 – April 7, 2004). During that time the FDA forced the defendants to strengthen the warning

24   label several times. The enhanced warnings followed in the wake of the results of additional

25   cardiovascular studies performed by Defendants, as well as numerous complaints to the FDA

26   regarding various adverse events.

27        33.    Prior to strengthening the warning for Bextra, Defendants had knowledge

28   of the coronary and cardiovascular safety risks of Bextra from several studies. *See e.g.*, Otto,

1    E.O., *Efficacy and Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in*
2    *Patients Undergoing Coronary Artery Bypass Surgery, The Journal of Thoracic and*
3    *Cardiovascular Surgery*, June 2003 at 1481.

4        34.    Even Defendants' own (and Pfizer funded) post- drug approval meta-
5    analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data
6    showing an increased cardiovascular risk in patients treated with Bextra after undergoing
7    coronary artery bypass graft surgery.  Observed events included heart attack, stroke, and blood
8    clots in the legs and lungs. The results were particularly relevant and striking as each of the study
9    participants who was a post-bypass surgery patient was taking anti-clotting agents at the time
10    their exposure to Bextra was being tracked.

11        35.    In mid-January 2005, a peer-reviewed paper from the University of
12    Pennsylvania found that in patients having heart bypass surgery, those who took Bextra in the
13    intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a
14    heart attack or stroke.

15        36.    Despite years of studies on selective COX-2 inhibitors, as well as the
16    disturbing new studies specifically analyzing the risks of Bextra, Defendants failed to take any
17    action to protect the health and welfare of patients, but instead, continued to promote the drug for
18    sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis
19    Drug Advisory Committee meetings.

20        37.    On April 7, 2005, the FDA finally insisted that Defendants "voluntarily
21    withdraw" Bextra from the U.S. market, stating:

22            . . . the Agency has concluded that the overall risk versus benefit
             profile of Bextra is unfavorable. This conclusion is based on the
23           potential increased risk for serious cardiovascular (CV) adverse
             events, which appears to be a class effect of non-steroidal anti-
24           inflammatory drugs (NSAIDs) (excluding aspirin) … and the fact
             that Bextra has not been shown to offer any unique advantage over
25           the other available NSAIDs. (FDA Alert for Healthcare
             Professionals, April 7, 2005.)
26
             Continuing, the FDA noted:
27
             Bextra has been demonstrated to be associated with an increased
28           risk of serious adverse CV events in two short-term trials in patients

Bextra-MDL                        - 8 -                         COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> immediately post-operative from coronary artery bypass graft
> (CABG) surgery . . . . FDA has concluded that it is reasonable to
> extrapolate the adverse CV risk information for Bextra from the
> short-term CABG trials to chronic use given the fact that other
> COX-2 selective NSAIDs have been shown in long-term controlled
> clinical trials to be associated with an increased risk of serious
> adverse CV events (e.g., death, MI, stroke), and the well described
> risk of serious, and often life-threatening gastrointestinal
> bleeding . . . . To date, there have been no studies that demonstrate
> an advantage of Bextra over other NSAIDs that might offset the
> concern about the serous skin risks, such as studies that show a GI
> safety benefit, better efficacy compared to other products, or
> efficacy in a setting of patients who are refractory to treatment with
> other products."

38.     Dr. Garret A. Fitzgerald, cardiologist and pharmacologist at the University

of Pennsylvania, presented the preliminary results of his Bextra study at the American Heart

Association meeting in New Orleans, Louisiana. His study, containing 12 trials including 5,930

patients, found 2.19 times the number of strokes among patients given Bextra. *Named Plaintiff's*

*Home District Times*, Nov. 10, 2004.

39.     Instead of studying Bextra prior to its market launch, the Defendants

simply relied upon data and information gathered from Celebrex trials and studies. The Celebrex

data put Pfizer on notice that Cox-2 NSAIDs are, at the very least, associated with a

disproportionately increased number of adverse cardiovascular events. Taking the results from

the Celebrex trials in conjunction with the available medical literature; the Defendants knew

about the increased incidence and association between Bextra and the potentially life-threatening

dangers it could cause.

40.     The Named Plaintiff's Home District Times uncovered the truth about the

inadequate studies by interviewing Pfizer researcher Dr. Feczko - Pfizer's president for

worldwide development.

> Over all, Pfizer has performed much less research on Bextra than
> on Celebrex, Dr. Feczko said. Most of the company's studies of
> Bextra have been short term, with many lasting only two weeks.
> As a result, Pfizer has less data to support its contention that Bextra
> is safe , he said.

***

Dr. Feczko of Pfizer explained that the company felt it was not as

1

2

> important to study Bextra extensively because the company
> believed that the drug was similar to Celebrex.

*The Named Plaintiff's Home District Times*, February 5, 2005.

3

4

5

6

7

41.     The Celebrex data relied upon by the Defendants was not adequate. On July 23, 2005, the New England Journal of Medicine published the results of its investigative research noting: "Most data on the cardiovascular risks associated with celecoxib have come from observational studies or short-term randomized trials." N. ENG. J. MED. 352;25 at 2649.

8

9

10

11

12

13

14

15

42.     On December 23, 2004, three (3) researchers from the well-respected Vanderbilt University published an article in the New England Journal of Medicine. The doctors wrote: "To protect the safety of the public, we write to recommend that clinicians stop prescribing Valdecoxib (Bextra) except in extraordinary circumstances." N. ENG. J. MED. 351;26. The authors cite to two (2) recent studies "which showed a 3-fold increase in serious cardiovascular injuries in patients receiving Valdecoxib after coronary-artery bypass grafting." Later, on February 17, 2005, the New England Journal of Medicine published the results of a study conducted by eight (8) doctors with similarly alarming results. N. ENG. J. MED. 2005;352.

16

17

18

19

20

21

43.     In January 2005, Drs. Fitzgerald, Furberg and Psaty published an editorial in *Circulation*, the official journal of the American Heart Association. This editorial was based on a meta-analysis of two (2) clinical studies, and discusses the association between intravenous administration of an identical drug, and oral administration of Bextra. All three doctors found a "3-fold higher risk of cardiovascular injuries with the drug than with a placebo." *Cir.* 2005; 111:249.

22

23

24

25

44.     The scientific data available during and after Bextra's approval process made clear to Defendants that their formulation of Bextra would cause a higher risk of blood clots, stroke and/or myocardial infarctions among Bextra consumers, alerting them to the need to do additional and adequate safety studies.

26

27

28

45.     As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular

1    risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with

2    established coronary artery disease, who frequently have coexisting osteoarthritis requiring

3    medication and have the highest risk of further cardiovascular events."

4         46.    Dr. Topol was also the author on the study published in August 2001 in

5    JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in

6    persons who used COX-2 inhibitors.

7         47.    Based upon readily available scientific data, Defendants knew, or should

8    have known, that their pre-approval testing of Bextra did not adequately represent the cross-

9    section of individuals who were intended consumers and therefore, likely to take Bextra.

10   Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for

11   Bextra (noting that: "Platelets: In four clinical studies with young and elderly (≥ 65 years)

12   subjects, single and multiple doses up to 7 day mg BID had not effect on platelet aggregation").

13        48.    Had Defendants done adequate testing prior to approval and "market

14   launch," rather than the extremely short duration studies done on the small size patient base that

15   was actually done) Pharmacia and Searle's scientific data would have revealed significant

16   increases in incidence of strokes and myocardial infarctions among the intended and targeted

17   population of Bextra consumers. Adequate testing would have shown that Bextra possessed

18   serious side effects. Defendants should have taken appropriate measures to ensure that their

19   defectively designed product would not be placed in the stream of commerce and/or should have

20   provided full and proper warnings accurately and fully reflecting the scope and severity of

21   symptoms of those side effects should have been made.

22        49.    In fact, post-market approval data did reveal increased risks of clotting,

23   stroke and myocardial infarction, but Defendants intentionally suppressed this information in

24   order for them to gain significant profits from continued Bextra sales.

25        50.    Defendants' failure to conduct adequate testing and/or additional testing

26   prior to "market launch" was based upon their desire to generate maximum financial gains for

27   themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2

28   inhibitor market. At the time Defendants manufactured, advertising, and distributed Bextra to

Bextra-MDL                          - 11 -                          COMPLAINT

1  consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding

2  the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants

3  knew that if such increased risks were disclosed, consumers would not purchase Bextra, but

4  instead would purchase other cheaper and safer NSAIDs.

5
### D.    Facts Regarding Defendants' Marketing and Sale of Bextra

6          51.    The defendants rushed Bextra to the market in an effort to regain Cox-2

7  market share. In response to the introduction of Vioxx, and without performing adequate

8  research, the Defendants hastily introduced their own more selective Cox-2 inhibitor, Bextra, to

9  the market. In doing so, Pfizer, admittedly, relied upon problematic research results from its

10  study of Celebrex.

11          52.    Pfizer stuck to its original plan – focus on marketing and avoid studying

12  Bextra. Thus, it was reported: "The positioning for Bextra began more than a year and a half

13  before it hit the market. Pharmacia conducted research about the arthritis market to examine gaps

14  in treatment, said Sylvia McBrinn, Pharmacia's Vice President for global marketing for Bextra."[1]

15  Bextra's marketing research was conducted over a year and a half, while science took a backseat,

16  with one small study for Bextra lasting not even one year and the rest lasting only weeks in

17  duration.

18          53.    At all times relevant herein, Defendants engaged in a marketing campaign

19  with the intent that consumers would perceive Bextra as a safer and better drug than its other

20  NSAIDs and, therefore, purchase Bextra.

21          54.    Such an ineffective and unreasonably dangerous drug could only be widely

22  prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the

23  Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and

24  misleading advertising, consumers would not have purchased Bextra, a more costly prescriptive

25  drug, that was not effective for its intended purposes.

26          55.    On January 10, 2005 the FDA issued Pfizer a written reprimand for its

27  promotional activities. The reprimand reads: "These five promotional pieces [3 Celebrex and 2

28
---
[1] *New Jersey Record*, North Jersey Media Group, Inc., April 14, 2002.

Bextra-MDL                           - 12 -                              COMPLAINT

1  Bextra] variously: omit material facts ... and make misleading safety, unsubstantiated superiority,

2  and unsubstantiated effectiveness claims." This was not the Defendants first offense related to its

3  Cox-2 inhibitors. The FDA also reprimanded Pfizer on October 6, 1999 noting: "DDMAC has

4  reviewed these promotional pieces and has determined that they are false or misleading because

5  they contain unsubstantiated comparative claims, misrepresentations of Celebrex's safety profile,

6  and are lacking in fair balance."

7         56.    Bextra was never approved for the treatment of acute pain. Without such

8  approval, Pfizer was prohibited from marketing Bextra for such an indication. Nevertheless, in

9  May of 2002, Pfizer issued a press release announcing the publication of a study in the Journal of

10  the American Dental Ass'n (JADA) concluding that Bextra is effective in the treatment of acute

11  pain associated with dental surgery. Interestingly, the dental study was sponsored by the

12  defendants and three of the five authors were employees of Pharmacia.

13         57.    Essentially, Pfizer was attempting to circumvent the FDA by promoting a

14  study it funded and authored for an unapproved use. Once the results were published, Pfizer's

15  aggressive promotional campaign continued. Pfizer issued a press release touting Bextra's

16  efficacy for the treatment of acute pain. After the press release, Dr. Steve Geis, Group Vice

17  President of Clinical Research was reported to have said the following: "Post-surgical pain can be

18  under-managed and cause patients tremendous discomfort. ... This investigational study suggests

19  that Bextra may offer promise in acute pain management and further study is required."[2]

20         58.    Defendants widely and successfully marketed Bextra throughout the

21  United States by, among other things, conducting promotional campaigns that misrepresented the

22  efficacy of Bextra in order to induce a widespread use and consumption. Bextra was represented

23  to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made

24  misrepresentations by means of media advertisements, and statements contained in sales literature

25  provided to Plaintiff's prescribing physicians.

26         59.    Despite knowledge of the dangers presented by Bextra, Defendants and

27  Defendants' predecessors in interest, through their officers, directors and managing agents for the

28

[2] Press Release: docguide.com March 25, 2002.

Bextra-MDL               - 13 -               COMPLAINT

1    purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy
2    the known defects of Defendants' product, Bextra, and failed to warn the public, including
3    Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product,
4    Bextra. Defendants and their officers, agents and managers intentionally proceeded with the
5    inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,
6    Bextra, knowing that persons would be exposed to serious potential danger, in order to advance
7    their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a
8    conscious disregard for the safety of the public and particularly of Plaintiff.

9          60.    In an elaborate and sophisticated manner, Defendants aggressively
10    marketed Bextra directly to consumers and medical professionals (including physicians and
11    leading medical scholars) in order to leverage pressure on third party payors, medical care
12    organizations, and large institutional buyers (*e.g.*, hospitals) to include Bextra on their
13    formularies. Faced with the increased demand for the drug by consumers and health care
14    professionals that resulted from Defendants' successful advertising and marketing blitz, third
15    party payors were compelled to add Bextra to their formularies. Defendants' marketing campaign
16    specifically targeted third party payors, physicians, and consumers, and was designed to convince
17    them of both the therapeutic and economic value of Bextra.

18          61.    Defendants represented that Bextra was similar to ibuprofen and naproxen
19    but was superior because it lacked any of the common gastrointestinal adverse side effects
20    associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance,
21    NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with
22    long-term use. Defendants promoted Bextra as a safe and effective alternative that would not
23    have the same deleterious and painful impact on the gut, but that would be just as effective, if not
24    more so, for pain relief.

25          62.    Bextra possessed dangerous and concealed or undisclosed side effects,
26    including the increased risk of serious cardiovascular events, such as heart attacks, unstable
27    angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as
28    strokes. In addition, Bextra was no more effective than traditional and less expensive NSAIDs

1    and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal

2    bleeding.  Defendants chose not to warn about these risks and dangers.

3        63.    Defendants knew of these risks before the U.S. Food and Drug

4    Administration (the "FDA") approved Bextra for sale on November 16, 2001, but Defendants

5    ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied

6    inefficacy in its promotion, advertising, marketing, and sale of Bextra.  Defendants' omission,

7    suppression, and concealment of this important information enabled Bextra to be sold to, and

8    purchased, or paid for by, the Consumers at a grossly inflated price.

9        64.    Consequently, Bextra captured a large market share of anti-inflammatory

10   drugs prescribed for and used by patients.  In 2004 alone sales of Bextra exceeded $1 billion,

11   despite the significantly higher cost of Bextra as compared to other pain relievers in the same

12   family of drugs.

13       65.    Because Defendants engaged in a promotional and marketing campaign

14   that featured an advertising blitz directly targeted to consumers, that touted Bextra as a safer drug

15   than other drugs in its class, while uniformly failing to disclose the health risks of Bextra,

16   Defendants were able to justify pricing Bextra significantly higher than the cost of generic

17   aspirin.  In reality, that price inflation was not justified.  Had Defendants disclosed the truth about

18   Bextra, Defendants would not and could not have reaped the billions of dollars in Bextra sales

19   that were achieved as a direct result of the concealment, omission, suppression, and obfuscation

20   of the truth.

21       66.    Instead of revealing the risks of Bextra, Defendants intentionally

22   downplayed the risks from Bextra in news releases when Bextra's safety was challenged for the

23   first time in the mainstream media.  *See e.g.*, Nov. 10, 2004 Pfizer News Release ("Pfizer Inc.

24   said a Named Plaintiff's Home District Times article published today draws unsubstantiated

25   conclusions about the cardiovascular safety of its Cox-2 medicine Bextra . . .").  Defendants

26   similarly had earlier downplayed the risks in communicating to healthcare providers misleadingly

27   stating that "available clinical information for Bextra suggests there is no increased risk of

28   cardiovascular thromboembolic events in people treated for osteoarthritis (OA) and rheumatoid

1    arthritis (RA)" Oct. 15, 2004 *Pfizer News Release*. Defendants intentionally, deliberately,

2    knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material

3    information regarding the risks, dangers, defects, and disadvantages of Bextra from Plaintiff, the

4    public, the medical community, and the regulators. This concealment and omission was

5    deliberate, knowing, active, and uniform, was intended to induce and maximize sales and

6    purchases of Bextra, and prevented Plaintiff from obtaining all the material information that

7    would be important to their decisions as reasonable persons to purchase, pay for, and/or use

8    Bextra.

9         67.     Defendants' systematic, active, knowing, deliberate, and uniform

10   concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or

11   use Bextra; and caused Plaintiff's losses and damages as asserted herein.

12        68.     Had Defendants done adequate testing prior to approval and "market

13   launch," Pharmacia's scientific data would have revealed significant increases in stroke and

14   myocardial infarction amongst the intended population of Bextra consumers. Adequate testing

15   would have shown that Bextra possessed serious side effects. Defendants should have taken

16   appropriate measures to ensure that their defectively designed product would not be placed in the

17   stream of commerce and/or should have provided full and proper warnings accurately and fully

18   reflecting the scope and severity of symptoms of those side effects should have been made.

19        69.     In fact, post-market approval data did reveal increased risks of clotting,

20   stroke and myocardial infarction, but this information was intentionally suppressed by Defendants

21   in order for them to gain significant profits from continued Bextra sales.

22        70.     Defendants' failure to conduct adequate testing and/or additional testing

23   prior to "market launch" was based upon their desire to generate maximum financial gains for

24   themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2

25   inhibitor market.

26        71.     At the time Defendants manufactured, advertising, and distributed Bextra

27   to consumers, Defendants intentionally or recklessly ignored and/or withheld information

28   regarding the increased risks of hypertension, stroke and/or myocardial infarctions because

1  Defendants knew that if such increased risks were disclosed, consumers would not purchase

2  Bextra, but instead would purchase other cheaper and safer NSAID drugs.

3        72.    At all times relevant herein, Defendants engaged in a marketing campaign

4  with the intent that consumers would perceive Bextra as a better drug than its competitors and,

5  therefore, purchase Bextra.

6                              **CLAIMS FOR RELIEF**

7                          **FIRST CLAIM FOR RELIEF:**
                                **Negligence**
8
        73.    Plaintiff incorporates by reference all of the paragraphs of this Complaint
9
   as if fully set forth herein.
10
        74.    Defendants owed Plaintiff a duty to exercise reasonable care when
11
   designing, manufacturing, marketing, advertising, distributing, and selling Bextra.  This duty
12
   included the duty not to introduce a pharmaceutical drug, such as Bextra, into the stream of
13
   commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side
14
   effects.
15
        75.    At all relevant times to this action, Defendants owed a duty to properly
16
   warn Plaintiff and the Public of the risks, dangers and adverse side effects of their pharmaceutical
17
   drug Bextra.
18
        76.    Defendants breached their duties by failing to exercise ordinary care in the
19
   preparation, design, research, testing, development, manufacturing, inspection, labeling,
20
   marketing, promotion, advertising and selling of Bextra, including:
21
              a.    failing to use due care in the preparation and development of Bextra
22
   to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;
23
              b.    failing to use due care in the design of Bextra to prevent the
24
   aforementioned risk of injuries to individuals when the drugs were ingested;
25
              c.    failing to conduct adequate pre-clinical testing and research to
26
   determine the safety of Bextra;
27

28

1          d.      failing to conduct adequate post-marketing surveillance and
2   exposure studies to determine the safety of Bextra;

3          e.      failing to completely, accurately and in a timely fashion, disclose
4   the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff,
5   consumers, the medical community, and the FDA;

6          f.      failing to accompany Bextra with proper warnings regarding all
7   possible adverse side effects associated with the use of Bextra;

8          g.      failing to use due care in the manufacture, inspection, and labeling
9   of Bextra to prevent the aforementioned risk of injuries to individuals who used Bextra;

10          h.      failing to use due care in the promotion of Bextra to prevent the
11   aforementioned risk of injuries to individuals when the drugs were ingested;

12          i.      failing to use due care in the sale and marketing of Bextra to
13   prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

14          j.      failing to use due care in the selling of Bextra to prevent the
15   aforementioned risk of injuries to individuals when the drugs were ingested;

16          k.      failing to provide adequate and accurate training and information to
17   the sales representatives who sold Bextra;

18          l.      failing to provide adequate and accurate training and information to
19   healthcare providers for the appropriate use of Bextra; and

20          m.      being otherwise reckless, careless and/or negligent.

21          77.      Despite the fact that Defendants knew or should have known that Bextra
22   caused unreasonable and dangerous side effects which many users would be unable to remedy by
23   any means, Defendants continued to promote and market Bextra to consumers, including
24   Plaintiff, when safer and more effective methods of pain relief were available.

25          78.      Defendants were, or should have been, had they exercised reasonable care,
26   in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,
27   they continued to market their products by providing false and misleading information with
28   regard to the safety and efficacy of Bextra.

1          79.    Defendants knew or should have known that consumers such as Plaintiff

2 would foreseeably suffer injury as a result of their failure to exercise ordinary care as described

3 above.

4          80.    As a result of Defendants' actions, Plaintiff, and the Plaintiff's prescribing

5 physicians were unaware, and could not have reasonably known or have learned through

6 reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,

7 and that those risks were the direct and proximate result of Defendants' acts, omissions, and

8 misrepresentations.

9          81.    Defendants were, or should have been had they exercised reasonable care,

10 in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

11 they continued to market their products by providing false and misleading information with

12 regard to the safety and efficacy of Bextra.

13        82.    Defendants knew or should have known that consumers such as Plaintiff

14 would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

15 above.

16        83.    As a direct and proximate consequence of Defendants' acts, omissions, and

17 misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

18 required and will require healthcare and services; has incurred and will continue to incur medical

19 and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

20 future; has suffered and will continue to suffer mental anguish, diminished capacity for the

21 enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

22 preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

23 direct medical losses and costs include care for hospitalization, physician care, monitoring,

24 treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

25        84.    Defendants' conduct was committed with knowing, conscious, wanton,

26 willful, and deliberate disregard for the value of human life and the rights and safety of

27 consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

28 as to punish Defendants and deter them from similar conduct in the future.

1    WHEREFORE, Plaintiff demands judgment against Defendants and seeks

2    compensatory damages, and exemplary and punitive damages together with interest, the costs of

3    suit and attorneys' fees and such other and further relief as this Court deems just and proper.

4    
### SECOND CLAIM FOR RELIEF:
### Strict Liability – Defective Design and Failure to Warn

5
6    85.     Plaintiff incorporates by reference all previous paragraphs of this

7    Complaint as if fully set forth herein and further alleged as follows:

8    86.     At all times relevant to this action, Defendants were suppliers of Bextra,

9    placing the drug into the stream of commerce. Bextra was expected to and did reach Plaintiff

10   without substantial change in the condition in which it was manufactured and sold.

11   87.     Bextra was unsafe for normal or reasonably anticipated use.

12   88.     Bextra was defective in design or formulation because when it left the

13   hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous

14   than an ordinary consumer would expect. Bextra was also defective and unreasonably dangerous

15   in that the foreseeable risk of injuries from Bextra exceeded the benefits associated with the

16   design and/or formulation of the product.

17   89.     At all times material hereto, Bextra was sold, marketed, distributed,

18   supplied, manufactured and/or promoted by the Defendant, in a defective and unreasonably

19   dangerous condition at the time it was placed in the stream of commerce in ways which include,

20   but are not limited to, one or more of the following particulars.

21   90.     When placed in the stream of commerce, the drug contained unreasonably

22   dangerous design defects and was not reasonably safe as intended to be used, subjecting

23   Plaintiff's Plaintiff to risks which exceeded the benefits of the drug:

24   a.     When placed in the stream of commerce, it was defective in design

25   and formulation, making use of the drug more dangerous than an ordinary consumer would

26   expect and more dangerous than other similar drugs;

27   b.     The drug was insufficiently tested;

28

1          c.      The drug caused harmful side effects which outweighed any

2    potential utility;

3          d.      The drug was not accompanied by adequate instructions and/or

4    warnings to fully apprize the consumers, including the Plaintiff, of the full nature or extent of the

5    risks and side effects associated with use, thereby rendering Defendants liable to the Plaintiff and

6    Plaintiff, individually and collectively, pursuant to the Restatement (Second) of Torts, § 402A, as

7    adopted by the Named Plaintiff's Home District Courts.

8          91.     The drug was defective and unreasonably dangerous when it left the

9    possession of the Defendants in that it contained warnings insufficient to alert consumers,

10   including the Plaintiff, to the dangerous risks and reactions associated with the drug, including,

11   but not limited to, increased risk of cardiovascular events, and other serious and life threatening

12   side affects.

13         92.     The Plaintiff could not have discovered any defect in the drug through the

14   exercise of care.

15         93.     Defendants, as manufacturers of a prescription drug, are held to the level of

16   knowledge of an expert in the field.

17         94.     Bextra as manufactured and supplied by Defendants was also defective due

18   to inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate

19   reporting regarding the results of the clinical trials, testing and study. Defendants failed to

20   perform adequate testing before exposing Plaintiff to the medication, testing which would have

21   shown that Bextra had the potential to cause serious side effects including strokes like that which

22   affected Plaintiff.

23         95.     Bextra as manufactured and supplied by Defendants was defective due to

24   inadequate post-marketing warnings or instructions because, after Defendants knew or should

25   have known of the risk of injuries from Bextra, they failed to provide adequate warnings to the

26   medical community and the consumers, to whom they were directly marketing and advertising

27   Bextra; and, further, it continued to affirmatively promote Bextra as safe and effective.

28

1    96.    Bextra was manufactured, distributed, tested, sold, marketed, advertised

2    and promoted defectively by Defendants, and as a direct and proximate cause of Defendants'

3    defective design of Bextra, Plaintiff used Bextra rather than other safer and cheaper NSAIDs. As

4    a result, Plaintiff suffered the personal injuries described above.

5    97.    Information given by Defendants to the medical community and to the

6    consumers concerning the safety and efficacy of Bextra, especially the information contained in

7    the advertising and promotional materials, did not accurately reflect the potential side effects of

8    Bextra.

9    98.    Defendants had a continuing duty to warn the Plaintiff of the dangers

10    associated with the drug.

11    99.    Had adequate warnings and instructions been provided, Plaintiff would not

12    have taken Bextra, and would not have been at risk of the harmful side effects described herein.

13    100.    Defendants acted with conscious and deliberate disregard of the

14    foreseeable harm caused by Bextra.

15    101.    Defendants were, or should have been had they exercised reasonable care,

16    in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

17    they continued to market their products by providing false and misleading information with

18    regard to the safety and efficacy of Bextra.

19    102.    Defendants knew or should have known that consumers such as Plaintiff

20    would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

21    above.

22    103.    As a direct and proximate consequence of Defendants' acts, omissions, and

23    misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

24    required and will require healthcare and services; has incurred and will continue to incur medical

25    and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

26    future; has suffered and will continue to suffer mental anguish, diminished capacity for the

27    enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

28    preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

1   direct medical losses and costs include care for hospitalization, physician care, monitoring,

2   treatment, medications, and supplies.  Plaintiff will continue to incur such losses in the future.

3          104.    Defendants' conduct was committed with knowing, conscious, wanton,

4   willful, and deliberate disregard for the value of human life and the rights and safety of

5   consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

6   as to punish Defendants and deter them from similar conduct in the future.

7          WHEREFORE, Plaintiff demands judgment against Defendants and seeks

8   compensatory damages, and exemplary and punitive damages together with interest, the costs of

9   suit and attorneys' fees and such other and further relief as this Court deems just and proper.

10

11                          **THIRD CLAIM FOR RELIEF:**
                            **Breach of Express Warranty**
12
           105.    Plaintiff incorporates by reference all of the paragraphs of this Complaint
13
    as if fully set forth herein.
14
           106.    Defendants expressly represented to Plaintiff and other consumers and the
15
    medical community that Bextra was safe and fit for its intended purposes, that it was of
16
    merchantable quality, that it did not produce any dangerous side effects, particularly any
17
    unwarned-of side effects, and that it was adequately tested.
18
           107.    These warranties came in the form of:
19
                   a.     Defendants' public written and verbal assurances of the safety and
20
    efficacy of Bextra;
21
                   b.     Press releases, interviews and dissemination via the media of
22
    promotional information, the sole purpose of which was to create an increased demand for
23
    Bextra, which failed to warn of the risk of injuries inherent to the ingestion of Bextra, especially
24
    to the long-term ingestion of Bextra;
25
                   c.     Verbal and written assurances made by Defendants regarding
26
    Bextra and downplaying the risk of injuries associated with the drug;
27

28

    Bextra-MDL                          - 23 -                          COMPLAINT

1                d.       False and misleading written information, supplied by Defendants,

2 and published in the Physician's Desk Reference on an annual basis, upon which physicians

3 relied in prescribing Bextra during the period of Plaintiff's ingestion of Bextra, and;

4                e.       advertisements.

5          108.      The documents referred to above were created by and at the direction of

6 Defendants.

7          109.      Defendants knew or had reason to know that Bextra did not conform to

8 these express representations in that Bextra is neither as safe nor as effective as represented, and

9 that Bextra produces serious adverse side effects.

10          110.      Bextra did not and does not conform to Defendants' express

11 representations because it is not safe, has numerous and serious side effects, including unwarned-

12 of side effects, and causes severe and permanent injuries.

13          111.      Plaintiff, other consumers, and the medical community relied upon

14 Defendants' express warranties.

15          112.      Defendants were, or should have been had they exercised reasonable care,

16 in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

17 they continued to market their products by providing false and misleading information with

18 regard to the safety and efficacy of Bextra.

19          113.      Defendants knew or should have known that consumers such as Plaintiff

20 would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

21 above.

22          114.      As a direct and proximate consequence of Defendants' acts, omissions, and

23 misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

24 required and will require healthcare and services; has incurred and will continue to incur medical

25 and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

26 future; has suffered and will continue to suffer mental anguish, diminished capacity for the

27 enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

28 preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

Bextra-MDL                     - 24 -                     COMPLAINT

1    direct medical losses and costs include care for hospitalization, physician care, monitoring,

2    treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

3            115.    Defendants' conduct was committed with knowing, conscious, wanton,

4    willful, and deliberate disregard for the value of human life and the rights and safety of

5    consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

6    as to punish Defendants and deter them from similar conduct in the future.

7            WHEREFORE, Plaintiff demands judgment against Defendants and seeks

8    compensatory damages, and exemplary and punitive damages together with interest, the costs of

9    suit and attorneys' fees and such other and further relief as this Court deems just and proper.

10                         **FOURTH CLAIM FOR RELIEF:**
                             **Breach of Implied Warranty**
11
              116.    Plaintiff incorporates by reference all of the paragraphs of this Complaint
12
     as if fully set forth herein.
13
              117.    Defendants manufactured, distributed, advertised, promoted, and sold
14
     Bextra.
15
              118.    At all relevant times, Defendants knew of the use for which Bextra was
16
     intended and impliedly warranted the product to be of merchantable quality and safe and fit for
17
     such use.
18
              119.    Defendants were aware that consumers, including Plaintiff, would use
19
     Bextra for treatment of pain and inflammation and for other purposes.
20
              120.    Plaintiff and the medical community reasonably relied upon Defendants'
21
     judgment and expertise to only sell them or allow them to prescribe Bextra only if it was indeed
22
     of merchantable quality and safe and fit for its intended use. Consumers, including Plaintiff, and
23
     the medical community, reasonably relied upon Defendants' implied warranty for Bextra.
24
              121.    Bextra reached consumers, including Plaintiff, without substantial change
25
     in the condition in which it was manufactured and sold by Defendants.
26
              122.    Defendants breached their implied warranty to consumers, including
27
     Plaintiff; Bextra was not of merchantable quality or safe and fit for its intended use.
28

Bextra-MDL                          - 25 -                                    COMPLAINT

1    123.    Defendants were, or should have been had they exercised reasonable care,

2    in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

3    they continued to market their products by providing false and misleading information with

4    regard to the safety and efficacy of Bextra.

5    124.    Defendants knew or should have known that consumers such as Plaintiff

6    would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

7    above.

8    125.    As a direct and proximate consequence of Defendants' acts, omissions, and

9    misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

10   required and will require healthcare and services; has incurred and will continue to incur medical

11   and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

12   future; has suffered and will continue to suffer mental anguish, diminished capacity for the

13   enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

14   preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

15   direct medical losses and costs include care for hospitalization, physician care, monitoring,

16   treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

17   126.    Defendants' conduct was committed with knowing, conscious, wanton,

18   willful, and deliberate disregard for the value of human life and the rights and safety of

19   consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

20   as to punish Defendants and deter them from similar conduct in the future.

21   WHEREFORE, Plaintiff demands judgment against Defendants and seeks

22   compensatory damages, and exemplary and punitive damages together with interest, the costs of

23   suit and attorneys' fees and such other and further relief as this Court deems just and proper.

24   **FIFTH CLAIM FOR RELIEF:**
     **Fraudulent Misrepresentation & Concealment**

25   127.    Plaintiff incorporates by reference all of the paragraphs of this Complaint

26   as if fully set forth herein.

27

28

Bextra-MDL                          - 26 -                          COMPLAINT

1      128.    Defendants' superior knowledge and expertise, their relationship of trust

2   and confidence with doctors and the public, their specific knowledge regarding the risks and

3   dangers of Bextra, and their intentional dissemination of promotional and marketing information

4   about Bextra for the purpose of maximizing its sales, each gave rise to the affirmative duty to

5   meaningfully disclose and provide all material information about Bextra's risks and harms to

6   doctors and consumers.

7      129.    Defendants made fraudulent affirmative misrepresentations with respect to

8   Bextra in the following particulars:

9           a.    Defendants represented through their labeling, advertising,

10  marketing materials, detail persons, seminar presentations, publications, notice letters, and

11  regulatory submissions that Bextra had been tested and found to be safe and effective for the

12  treatment of pain and inflammation; and

13          b.    Defendants represented that Bextra was safer than other alternative

14  medications.

15     130.    Defendants made affirmative misrepresentations; and fraudulently,

16  intentionally and/or recklessly concealed material adverse information regarding the safety and

17  effectiveness of Bextra.

18     131.    Defendants made these misrepresentations and actively concealed adverse

19  information at a time when Defendants knew or had reason to know that Bextra had defects and

20  was unreasonably dangerous and was not what Defendants had represented to the medical

21  community, the FDA and the consuming public, including Plaintiff.

22     132.    Defendants omitted, suppressed and/or concealed material facts concerning

23  the dangers and risk of injuries associated with the use of Bextra including, but not limited to, the

24  cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'

25  purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the

26  serious nature of the risks associated with the use of Bextra in order to increase its sales.

27     133.    The representations and concealment were undertaken by Defendants with

28  an intent that doctors and patients, including Plaintiff, rely upon them.

Bextra-MDL                          - 27 -                          COMPLAINT

1                134.     Defendants' representations and concealments were undertaken with the

2   intent of defrauding and deceiving Plaintiff, other consumers, and the medical community to

3   induce and encourage the sale of Bextra.

4                135.     Defendants' fraudulent representations evinced their callous, reckless,

5   willful, and depraved indifference to the health, safety, and welfare of consumers, including

6   Plaintiff.

7                136.     Plaintiff's physician and Plaintiff relied on and were induced by

8   Defendants' misrepresentations, omissions, and/or active concealment of the dangers of Bextra in

9   selecting Bextra treatment.

10                137.     Plaintiff and the treating medical community did not know that the

11   representations were false and were justified in relying upon Defendants' representations.

12                138.     Had Plaintiff been aware of the increased risk of side effects associated

13   with Bextra and the relative efficacy of Bextra compared with other readily available

14   medications, Plaintiff would not have taken Bextra.

15                139.     Defendants were, or should have been had they exercised reasonable care,

16   in possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless,

17   they continued to market their products by providing false and misleading information with

18   regard to the safety and efficacy of Bextra.

19                140.     Defendants knew or should have known that consumers such as Plaintiff

20   would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described

21   above.

22                141.     As a direct and proximate consequence of Defendants' acts, omissions, and

23   misrepresentations described herein, the Plaintiff, sustained serious cardiovascular injuries; has

24   required and will require healthcare and services; has incurred and will continue to incur medical

25   and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the

26   future; has suffered and will continue to suffer mental anguish, diminished capacity for the

27   enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

28   preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's

1  direct medical losses and costs include care for hospitalization, physician care, monitoring,

2  treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

3       142.   Defendants' conduct was committed with knowing, conscious, wanton,

4  willful, and deliberate disregard for the value of human life and the rights and safety of

5  consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so

6  as to punish Defendants and deter them from similar conduct in the future.

7       WHEREFORE, Plaintiff demands judgment against Defendants and seeks

8  compensatory damages, and exemplary and punitive damages together with interest, the costs of

9  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

10  

**SIXTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

11

12       143.   Plaintiff incorporates by reference all previous paragraphs of this

Complaint as if fully set forth herein.

13

14       144.   At all times relevant to this action, Defendants were the manufacturers,

sellers, and/or suppliers of Bextra.

15

16       145.   Plaintiff paid for Bextra for the purpose of managing her pain safely and

effectively.

17

18       146.   Defendants have accepted payment from Plaintiff for the purchase of

Bextra.

19

20       147.   Plaintiff did not receive the safe and effective pharmaceutical product for

which Plaintiff paid.

21

22       148.   It is inequitable and unjust for Defendants to retain this money because the

Plaintiff did not in fact receive the product Defendant represented Bextra to be.

23

24       WHEREFORE, Plaintiff demands judgment against Defendants and seeks

equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court

25  deems just and proper.

26

27

28

1

**PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiff requests the following relief:

3          1.      General damages in excess of the jurisdictional amount of this Court;

4          2.      Consequential damages;

5          3.      Disgorgement of profits;

6          4.      Restitution;

7          5.      Punitive and exemplary damages;

8          6.      Pre-judgment and post-judgment interest as provided by law;

9          7.      Recovery of Plaintiff's costs including, but not limited to, discretionary

10  Court costs of these causes, and those costs available under the law, as well as expert fees and

11  attorneys' fees and expenses, and costs of this action; and

12          8.      Such other and further relief as the Court deems just and proper.

13

14  Dated: February 1, 2008                    Respectfully submitted,

15

16                                             By:_____

17                                             B. Kristian W. Rasmussen, FL Bar No. 0229430
                                               Cory, Watson, Crowder, & DeGaris
18                                             2131 Magnolia Avenue, STE 200
                                               Birmingham, AL 35205
19                                             Phone: (205) 328-2200
                                               Fax: (205) 324-7896
20                                             E-Mail: krasmussen@cwcd.com

21                                             Attorneys for Plaintiff

22

23

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff demands a trial by jury on all claims so triable in this action.

3   Dated: February 1, 2008                    Respectfully submitted,

4

5

6                                             By:_____

7                                             B. Kristian W. Rasmussen, FL Bar No. 0229430
                                              Cory, Watson, Crowder, & DeGaris
8                                             2131 Magnolia Avenue, STE 200
                                              Birmingham, AL 35205
9                                             Phone: (205) 328-2200
                                              Fax: (205) 324-7896
10                                            E-Mail: krasmussen@cwcd.com

11

12                                            Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Brian Scogin, individually | Pfizer, Inc., Pharmacia Corp., and G.D. Searle & Co. |

| (b) County of Residence of First Listed Plaintiff    Lonoke | County of Residence of First Listed Defendant    New York |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Cory Watson Crowder & DeGaris, P.C., 2131 Magnolia Avenue, Birmingham, Alabama 35205, (205) 328-2200 | |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☒ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☒ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C.A § 332

Brief description of cause:
Negligence Products Liability

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE  Breyer

DOCKET NUMBER MDL 1699

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 04/05/2006 | |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____